# EXHIBIT B

# OPERATING AGREEMENT

# OF

# 1416 EASTERN AVE NE LLC

**FEBRUARY 8, 2021**

## OPERATING AGREEMENT
## OF
## 1416 EASTERN AVE NELLC

THIS OPERARTING AGREEMENT (the "Agreement") is made and entered into, effective for all purposes and in all respects as of the 8th day of February 2021, by and between the undersigned parties.

WHEREAS, certain parties hereto previously formed (or caused to be formed) a limited liability company, known as "1416 EASTERN AVE NE LLC" [the "Company", as defined herein], under and pursuant to the "Act" (as defined herein) and other relevant laws of the District of Columbia; and

WHEREAS, the undersigned desire to reflect, among other things, the terms and conditions of their agreements and understandings with respect to the ownership and operation of the Company.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby covenant and agree as follows:

1.      Definitions.

"Act" shall mean and refer to the District of Columbia Uniform Limited Liability Company Act of 2010, as amended [D.C. LLC Act].

"Additional Funds" shall have the meaning ascribed to such term in subparagraph 6(b) hereof.

"Affiliate" (and its derivatives) of a Person shall mean and refer to (i) any officer, director, trustee, partner, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such Person; (ii) any corporation, partnership, trust or other entity controlling, controlled by or under common control with such Person; (iii) any officer, director, trustee, partner, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, trust or other entity controlling, controlled by or under common control with such Person; (iv) any relative or spouse (or any relative of such spouse) of any natural Person included in clauses (i) or (iii) above, who shares the same home as such natural Person; and (v) any person or entity defined as an Affiliate under paragraph 13 hereof.

"Agreement" shall mean and refer to this Operating Agreement and Exhibits A, B C and D attached hereto, as originally executed and as may be amended from time to time in writing.

" 1416 EASTERN AVE NE LLC" or "Contributing Equity Members" shall mean and refer to that Entity, Person or those Persons designated as such in Exhibit A, either individually or collectively.

"Articles" shall mean and refer to those certain Articles of Organization of the Company filed with, and accepted by, the District of Columbia DCRA, as the same may be amended, modified, supplemented and/or restated from time to time.

"Bankruptcy" (and any derivations thereof) shall mean and refer to an adjudication of bankruptcy under Title 11 of the United States I.R.C., as amended, an assignment for the benefit of creditors and/or an adjudication of insolvency or bankruptcy under any state or local insolvency statute or procedure or the occurrence of any other event of insolvency or bankruptcy under the Act.

"Capital Account" shall, with respect to each Member, mean and refer to the separate "book" account for such Member to be established and maintained in all events in the manner provided under, and in accordance with, Treasury Regulation §1.704-1(b)(2)(iv), as amended, and in accordance with the other provisions of Treasury Regulation §1.704-1(b)  To that end, consistent with the provisions of Treasury Regulation §1.704-1(b)(2)(iv)(f), the Capital Account of a Member may be adjusted upward or downward to reflect any "book" gain or loss attributable to a Company asset upon the occurrence of an event described in Treasury Regulation §1.704-1(b)(2)(iv)(f)(5) (e.g., Capital Contribution, liquidating distribution, issuance of a profits interest, etc.), as if such gain or loss had been recognized on an actual sale of each such and allocated pursuant to Section 7(b).  In furtherance of and consistent with the foregoing, a Member's Capital Account shall include generally, without limitation, the Capital Contributions of such Member (as of any particular date), (i) increased by such Member's allocated share of profits, income and gain of the Company (including, if such date is not the close of the Company Accounting Year, the allocated share of profits, income and gain of the Company for the period from the close of the last Company Accounting Year to such date), and (ii) decreased by such Member's allocated share of losses and deductions of the Company and distributions by the Company to such Member (including, if such date is not the close of the Company Accounting Year, the allocated share of losses and deductions of the Company and distributions by the Company during the period from the close of the last Company Accounting Year to such date).  For purposes of the foregoing, distributions of property shall result in a decrease in a Member's Capital Account equal to the agreed fair market value of such property distributed (less the amount of indebtedness, if any, of the Company which is assumed by such Member and/or the amount of indebtedness, if any, to which such property is subject, as of the date of distribution) by the Company to such Member.

"Capital Contribution" or "Capital Contributions" shall mean and refer to the amount of cash and/or the agreed fair market value of property [less the amount of indebtedness, if any, of a contributing Member which is assumed by the Company and/or the amount of indebtedness, if any, to which such property is subject, as of the date of contribution (without regard to the provisions of I.R.C. Section 7701(g))] actually contributed by (or on behalf of) a Member to the capital of the Company, including, but not limited to, any additional Capital Contributions actually made pursuant to this Agreement, senior notes contributed, and any amounts paid by a Member (except to the extent indemnification is made by another Member) in

- 2 -

respect of any claims, liabilities or obligations against the Company and/or pursuant to any guaranty of Company indebtedness or otherwise by such Member.

"Capital Proceeds" of the Company shall mean and refer to the net proceeds, after payment of or due provision for expenses of the Company which the Managers creates reserves to fund and all liabilities to creditors of the Company (including loans from Members or Affiliates thereof, if any), resulting from (i) the sale, exchange or other disposition of all or a substantial part of the Company Assets, including, but not limited to, the Property, (ii) the excess proceeds from the financing or refinancing of any loan to the Company (that is, any financing proceeds not needed for the repayment of the loan refinanced or for other obligations or expenditures of the Company) or (iii) the receipt by the Company of any proceeds from insurance settlements or other claims attributable to fire or other casualty with respect to the assets of the Company, including, but not limited to, the Property, or from partial condemnation, sales or grant of easements, rights-of-way or the like with respect to the assets of the Company, including, but not limited to, the Property, in excess of those needed for repair, restoration or replacement of the damaged, destroyed or condemned property.

"Company" shall mean and refer to 1416 EASTERN AVE NE LLC, a District of Columbia limited liability company formed under and pursuant to the Act and other relevant laws of the District of Columbia and operated pursuant to the terms of this Agreement.

"Company Accounting Year" shall mean and refer to the twelve (12)-month period ending December 31 of each year, which shall constitute the accounting year of the Company.

"Company Assets", at any particular time, shall mean and refer to the Property and any other assets or property (tangible or intangible, choate or inchoate, fixed or contingent) of the Company.

"Exhibit A" shall mean and refer to the original Exhibit A to this Agreement, relating to the names, addresses, Percentage Interests of the Members at company incorporation, as the same may be amended with the unanimous consent of all Members.

"Exhibit B" shall mean and refer to the original Exhibit B to this Agreement, relating to the legal description of the Company Assets, as the same may be amended with the unanimous consent of all Members.

"Exhibit C" shall mean and refer to the original Exhibit C to this Agreement, relating to the rights and responsibilities of the members and managers, as the same may be amended with the unanimous consent of all Members.

"Fair Market Value" of an Interest shall be determined based on the price which would be paid by a willing buyer to a willing seller in an arm's-length transaction for the purchase of such Interest, free and clear of any option, call, contract, commitment, demand, lien, charge, security interest or encumbrance of any kind whatsoever, as such price may be mutually determined by the interested Member and the Company, or, if the interested Member and the

Company cannot mutually agree upon such price within fifteen (15) days after the event triggering a determination of Fair Market Value, the Fair Market Value of such Interest shall be determined as follows: the interested parties shall agree on a single appraiser within thirty (30) days after the expiration of the fifteen (15)-day period above or, if the interested parties are unable to agree on a single appraiser, then the interested Member and the Company shall promptly appoint an appraiser, who or which shall determine mutually the Fair Market Value of such Interest, for purposes of an all-cash sale. All appraisers appointed hereunder shall be directed to take into account any "minority ownership discounts," "lack of marketability discounts" and/or other applicable valuation discounts in valuing such Interest. If the two (2) appraisers agree upon the fair market value of the Interest, they shall jointly render a single written report of their opinion thereon; provided, however, that, if the two (2) appraisers cannot agree upon the fair market value of the Interest and their respective appraisals are within ten percent (10%) of each other, then the Fair Market Value shall be the average of the two (2) appraisals; and provided, further that if the two (2) appraisers cannot agree upon the fair market value of the Interest and their respective appraisals are not within ten percent (10%) of each other, then they shall together appoint a third (3rd) appraiser, who or which shall determine the Fair Market Value of such Interest, and shall send written notice of such determination to each Member. All appraisers appointed shall be duly licensed and qualified by experience and ability to value entities similar to the Company; and the fees and other costs of each of the first two (2) appraisers shall be borne by the Member or the Company appointing each such appraiser, with the fees and other costs of the third (3rd) appraiser (if applicable) being shared equally by the Company and the Member. The Fair Market Value determined by the first two (2) appraisers or the third (3rd) appraiser (as the case may be) shall be used to determine the purchase price of the Interest; provided, however, that, if the Fair Market Value determined by the third (3rd) appraiser is more than the higher of the first two (2) appraisers, the higher determination of the first two (2) appraisers shall govern; and provided, further, that if the Fair Market Value determined by the third (3rd) appraiser is less than the lower determination of the first two (2) appraisers, the lower determination of the first two (2) appraisers shall govern.

"Sadegh Jafari" shall mean and refer to that Person or those Persons designated as such in Exhibit A, either individually or collectively.

"Interest", as to any Member, shall mean and refer to the entire ownership interest of such Member in the Company at any particular time, including such Member's Capital Account, Percentage Interest, right to distributions under paragraph 8 hereof and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement and the Act.

"I.R.C." shall mean and refer to the Internal Revenue Code of 1986, as amended, or any similar Federal internal revenue law enacted in substitution of the Internal Revenue Code of 1986, and the corresponding revenue law (and sections thereof) of any state or jurisdiction.

"Manager" or "Member" shall, subject to the provisions of paragraph 11 hereof, mean and refer to  Sadegh Jafari and any successors thereto.  No Person designated to serve as a Manager hereunder is required to either be a Member of the Company or a resident (or domestic corporation) of the District of Columbia.

"Net Capital Investment" shall, with respect to each Member, mean and refer to the Capital Contributions by such Member to the Company, reduced by any distributions to such Member pursuant to subparagraphs 8(c), 8(d)(i) and 8(d)(ii) hereof.

"Net Cash Flow" shall mean and refer to the total cash receipts of the Company (including, but not limited to, any gross operating receipts, and cash Capital Contributions of the Members), plus any other funds (including amounts previously set aside as reserves by the Managers, where and to the extent he no longer regards such reserves as reasonably necessary in the efficient conduct of the Company business) deemed available for distribution and designated as "Net Cash Flow" by the Managers, in his reasonable discretion, less the total cash disbursements of the Company [such as, but not limited to, operating expenses of the Company and repayments of any loans made to the Company by any Person whatsoever (including the Member and/or any Affiliates thereof)], and less such reserves or other uses of cash as the Managers, in his reasonable discretion, shall deem to be necessary for the efficient conduct of the Company business. Net Cash Flow shall exclude Capital Proceeds.

"Percentage Interest" of a Member shall mean and refer to the percentage equity in the Company of such Member as set forth opposite the name of such Member in Exhibit A attached hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof and as outlined in Exhibit A.

"Person" shall mean and refer to an individual or entity, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, limited liability company, trust or business association.

"Property" shall mean and refer to that certain parcel of residential real estate located at 1850-1854 KENDALL STREET NE, Washington, DC 20002, as more particularly described in Exhibit B attached hereto, together with all rights, privileges, interests, easements, improvements, hereditaments and appurtenances thereunto belonging or appertaining, and all fixtures, equipment and appliances thereon or thereat, and any additions thereto.

"Substituted Member(s)" shall mean and refer to that Person or those Persons admitted to the Company as a Member, in accordance with the provisions of paragraph 13 hereof and so reflected in Exhibit A.

2.    Name of Company.  The name of the Company shall continue to be "1416 EASTERN AVE NE LLC".

3.    Formation of Company.  The undersigned Members formed (or caused to be formed) the Company under and pursuant to the Act by filing the Articles (and any amended and restated articles of formation) on behalf of themselves and any additional or Substituted Members.  This Agreement is subject to, and governed by, the Act and the Articles.  In the event of a direct conflict between the provisions of this Agreement and either the mandatory provisions of the Act or the Articles, such mandatory provisions of the Act or the Articles (as the case may

be) will be controlling. As set forth in the Articles, the Company shall have perpetual existence, unless sooner terminated in accordance with the provisions of paragraph 15 hereof.

4.    <u>Company Purposes</u>. The general business purposes of the Company shall continue to be (i) to acquire, own, hold, develop, construct, lease, manage, operate and, if and when necessary and/or appropriate, sell or otherwise dispose of the Company Assets (or any portion thereof) for the production of a profit; and (ii) to engage in any and all activities incidental or related to the foregoing, and exercise all powers reasonable or necessary to pursue the same.

5.    <u>Principal Office; Registered Agent</u>. The principal office of the Company shall be 700 51ST STREET NE #102B WASINGTON DC 20019. The Managers may change the principal office of the Company and/or establish additional offices of the Company, either within or without the District of Columbia, as the Managers may deem advisable. The registered agent of the Company in the District of Columbia for service of process shall be MASTERPIECE PROPERTY MANAGEMENT LLC. The post office address of the registered agent of the Company shall be 700 51ST STREET NE #102B WASINGTON DC 20019.

6.    <u>Capital Contributions</u>.

(a)    Each of the Members has made Capital Contributions to the Company, as set forth in the books and records of the Company, for which such Member received appropriate credit to his Capital Account and, in connection therewith, such Member was issued the Percentage Interests set forth after such Member's name in Exhibit A attached hereto.

(b)    In the event that at any time (or from time to time) additional funds are required by the Company (including, without limitation, amounts required to fund any operating deficits of the Company) for or in respect of its business or any of its obligations, expenses, costs, liabilities or expenditures for any Company Accounting Year, then the Managers, acting for and on behalf of, and in the name of, the Company, in the exercise of his reasonable discretion, shall have the right (but not the obligation) to cause the Company to borrow such required funds (the "Additional Funds"), with interest payable at then-prevailing rates, from commercial banks, savings and loan associations and/or other lending institutions (including Members) as outlined by the rights and responsibilities in Exhibit C.

(c)    The provisions of this paragraph 6 are not intended to be for the benefit of, or enforceable by, any creditor or other Person (other than a Member in his capacity as a member) to whom or which any debts, liabilities or obligations are owed by (or who or which otherwise has any claim against) the Company or any Member; and no such creditor or other Person shall obtain any right under any such foregoing provision or shall by reason of any such foregoing provision make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member.

(d)    No Member shall be required to make any Capital Contribution to the Company beyond the amounts set forth in this paragraph 6, except as may be agreed to by such Member in writing as outlined by the rights and responsibilities in Exhibit C.

(e)    No interest shall accrue or be payable to any Member by reason of his Capital Contribution, Net Capital Investment or his Capital Account.

(f)    No Member (in his capacity as a member) shall be personally liable for losses, costs, expenses, liabilities or obligations of the Company in excess of his Capital Contributions or other obligations required under this paragraph 6, without such Member's prior written consent.

7.    <u>Allocation of Income and Losses</u>.

(a)    Subject to the provisions of subparagraph 7(b), the distributive shares of each item of Profit and Loss of the Company for each Company Accounting Year or other period shall be allocated to each Member, to the extent of and in proportion to the amounts necessary to cause the respective Capital Account of each Member to be equal to the aggregate amount of distributions that each such Member would then have received if the Company's remaining capital at such time were distributed in accordance with Section 17(b) hereof.

(b)    It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction and credit (or items thereof) shall be allocated in accordance with the provisions set forth in this paragraph 7 to the fullest extent permitted by I.R.C. Sections 704(b) and 704(c). In order to preserve and protect the allocations provided for in this paragraph 7, the Managers, with the review and concurrence of the Company's certified public accountants, is authorized and directed, in his reasonable discretion, to allocate income, gain, loss, deduction or credits (or items thereof) arising in any Company Accounting Year in a manner other than provided for in subparagraph 7(a) if, and to the extent that, the allocations otherwise provided for under this paragraph 7 would not be permissible under I.R.C. Sections 704(b) and/or 704(c). Any allocations made pursuant to, and in accordance with, this subparagraph 7(b) shall be deemed to be a complete substitute for any allocation otherwise provided in subparagraph 7(a), and no amendment of this Agreement or approval of any Member shall be required with respect thereto, unless such allocation under this subparagraph 7(b) would, or could, have a materially adverse effect on the balance of each Member's Capital Account relative to the balance of each Member's Capital Account had the allocation been made as provided for under subparagraph 7(a).

8.    <u>Distributions of Net Cash Flow</u>.

(a)    The Net Cash Flow shall be paid or distributed quarterly or at such additional time or times by the Managers, in the exercise of their reasonable discretion, among the Members in accordance with the provisions of this paragraph 8.

(b)    All distributions made within the Company Accounting Year shall be subject to adjustment by reference to the financial statements for such Company Accounting Year. If any additional amount is to be distributed by reason of such financial statements, such additional amount shall be deemed a distribution for such Company Accounting Year; and if any excess amount was distributed during such Company Accounting Year, as reflected by such financial statements, the excess amount shall be taken into account in reducing subsequent distributions.

(c)     Except to the extent Net Cash Flow shall be distributed upon termination of the Company pursuant to subparagraph 17(b) hereof, the Net Cash Flow generated during a Company Accounting Year shall be distributed during such Company Accounting Year (or within thirty (30) days of the end thereof) an aggregate amount of Net Cash Flow shall be distributed to the Members, pro rata, in proportion to their respective Percentage Interests.

(d)     Except to the extent Capital Proceeds shall be distributed upon termination of the Company pursuant to subparagraph 17(b) hereof, Capital Proceeds shall be distributed as follows and in the following order of priority at the timing specified by unanimous consent of all Members:

(i)     First, an aggregate amount of Capital Proceeds to 1416 EASTERN AVE NE LLC the extent of their Net Capital Investment;

9.     Resignation; Return of Capital.

(a) Notwithstanding anything expressly or implicitly to the contrary provided under the Act, no Member shall have the right, power or authority to withdraw from the Company or to demand and receive property of the Company or any distribution in return for his Capital Contribution.

(b) In the event that any Member resigns or otherwise withdraws from the Company in breach of this Agreement, including specifically, the provisions of subparagraph 9(a) above, such resignation or withdrawal shall, ipso facto, without any further action by the Company or any Members, constitute a default by such Member under this Agreement, for which the Company and the other Members shall have all rights and remedies, at law or in equity, under this Agreement or under applicable law, including, without limitation, the right to recover damages from such withdrawing Member, which damages may offset the amount otherwise distributable to such withdrawing Member under the provisions of paragraph 8 hereof.

10.     Legal Title to Company Assets.

(a) Legal title to the Company Assets shall be held in the name of the Company.

(b) It is understood and agreed that any Member's Interest shall be considered personal and not a real property interest.  Accordingly, no Member shall have the right to request a partition (or similar division) of the Company Assets (or any portion thereof).

11.     Management; Indemnification.

(a) (i) Subject to the provisions of Section 16, the business and affairs of the Company shall be managed jointly by the Managers, who shall, in their reasonable discretion and acting for and on behalf of the Company, have the full and entire right, power and authority to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purposes of the Company.  The Managers, each as a "Manager" (as such term is defined and applied under the Act) of the Company, shall devote to the management of the business of the Company so much of their time as the Managers, in their sole discretion, deems reasonably necessary to the

- 8 -

efficient operation of the Company business.  All decisions of the Managers shall require consent and approval as outlined in the rights and responsibilities in Exhibit C.

        (ii)     In furtherance of the provisions of subparagraph 11(a)(i) hereof, the Managers shall, in the exercise of their reasonable discretion, have the right, power and authority, acting for and on behalf of the Company, to enter into and execute any lease, contract, agreement, deed, mortgage, assignment, easement, or other instrument or document required or otherwise appropriate to lease, sell, mortgage, convey, finance or refinance the Company Assets (or any portion thereof), and to carry on any and all other activities related to the business of the Company, to borrow money and execute promissory notes (including, without limitation, notes which confess judgment), to secure the same by mortgage (which term "mortgage" is hereby defined for all purposes of this Agreement to include deeds of trust, financing statements, chattel mortgages, pledges, collateral assignments, assignment of leases, conditional sales contracts and similar security agreements) upon the Company Assets (or any portion thereof), to amend, modify, renew or extend any and all such loans or notes, and to convey the Company Assets (or any portion thereof) in fee simple by deed, mortgage or otherwise as outlined by the rights and responsibilities in Exhibit C.  In furtherance of the foregoing, each of the Managers may either jointly or with the consent of the other Manager execute documents and take other actions on behalf of the Company, which shall bind the Company and shall at all times be action authorized by the Company pursuant to the provisions of this Agreement; provided however, that any Manager acting individually on behalf of the Company shall not be considered the general agent of the Company, but rather shall function in a wholly ministerial capacity.

        (iii)    Subject to the other provisions of this Section 11 (including, without limitation, Section 11(a)(i) and Section 16), the Managers shall be responsible for efficient execution of the activities as outlined by the rights and responsibilities in Exhibit C.

        (iv)    In the event of the death, resignation, retirement, withdrawal or Bankruptcy of a Manager designated hereunder, then the surviving Managers shall designate and appoint a successor Manager, who or which shall have the right, power and authority to manage, oversee and administer the business and affairs of the Company in accordance with the provisions of this Agreement as outlined by the rights and responsibilities in Exhibit C.

        (b)     Except as otherwise set forth in this Agreement, the Managers shall not be paid a salary or other compensation for serving as the Managers of the Company or for performing their obligations and duties described herein.

        (c)    (i)     Each of the Managers shall be indemnified and held harmless by the Company from and against any and all claims, demands, liabilities, costs, expenses, damages and causes of action, of any nature whatsoever, arising out of or incidental to the management and supervision of the Company affairs, the acquisition of any Company Assets or as otherwise permitted under the Act, except where the claim at issue is based upon a specific finding of fraud or gross negligence of, or willful breach of any material provision of this Agreement by, such Manager.

        (ii)     The Managers shall not be liable, responsible or accountable in damages or otherwise to the Members or to the Company for any acts performed in good faith

and within the scope of this Agreement; provided, however, that, as noted in subparagraph 11(c)(i) above, the Managers shall be liable for their respective actions and/or omissions to the extent the same gross negligence of, or the willful breach of any material provision of this Agreement by, the Managers. The Managers shall not be personally liable for the return of the Capital Accounts of any Member.

(iii)   The indemnification authorized by this subparagraph 11(c) shall include, but not be limited to, payment of (A) reasonable attorneys' fees or other expenses incurred in connection with settlement or in any finally adjudicated legal proceeding, and (B) the removal of any liens affecting any property of the indemnitee.

(iv)   The indemnification rights contained in this subparagraph 11(c) shall be cumulative of, and in addition to, any and all rights, remedies and recourses to which the Managers shall be entitled, whether pursuant to the provisions of this Agreement, at law or in equity. Indemnifications shall be made solely and entirely from the Company Assets, and no Member shall be personally liable to any indemnitee under this subparagraph 11(c). Furthermore, the provisions of this subparagraph 11(d) are not intended to be for the benefit of any creditor or other Person to whom or which any debts, liabilities or obligations are owed by (or who or which otherwise has a claim against) the indemnitee; and no such creditor or other Person shall obtain any right under the provisions of this subparagraph 11(d) against the Company or any Member by reason of any debt, liability or obligation of (or other claim against) the indemnitee.

(d)   The Managers shall be fully and entirely reimbursed by the Company for any and all reasonable out-of-pocket costs and expenses incurred by him in direct connection with the formation of the Company, the acquisition or disposition by the Company of any of the Company Assets, the financing or refinancing of any Company indebtedness and/or the management and supervision of the Company business; provided, however, that, with respect to any such reimbursement, the Managers shall present the Company with such invoices, in such detail and with such receipts, as are reasonably necessary to substantiate such out-of-pocket costs and expenses.

(e)   In furtherance of the provisions of this paragraph 11, but subject to the consent of the other Managers as outlined by the rights and responsibilities in Exhibit C, a Manager may contract with any Person, including, without limitation, any Member, any entity in which any Member may have an interest and/or any Affiliate of a Member, at reasonable and competitive rates of compensation, commission or remuneration, for the performance of any and all services which may at any time be necessary, proper, convenient or advisable to carry on the business of the Company.

12. Related Party Dealings:

a)   Outside Business Interests; Business Opportunity- The Members may each engage in or possess interests in other business ventures of every kind and description for its own account, including without limitation, serving as a member, partner or shareholder of other entities which own, either directly or through interests in other entities, properties similar to the assets of the Company and neither the Company nor any of the Members shall have any rights by

virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom, or to any business opportunities as may become available to the Manager or any Member, whether or not similar in nature to the Company's then existing business activities.

        b)      Members Dealing with the Company-The fact that a Member or an affiliate thereof is employed by or is directly or indirectly interested in or connected with any person, firm or corporation employed by the Company for real estate management or otherwise to perform a service, or from or with which the Company may purchase any property or have other business dealings, shall not prohibit the Member from employing or otherwise dealing with such person, firm or corporation, so long as such business dealing, contract, or agreement follows and contains reasonable business terms. Neither the Company nor any of the Members shall have any rights in or to any income or profits derived therefrom. The said Member or his affiliated company shall not receive any benefit of any kind, other that is specifically and contractually agreed upon, in writing, between the respective companies and or parties

       13. <u>Bank Accounts; Books and Records</u>.

        (a)      The funds of the Company shall be deposited and maintained in one (1) or more bank accounts as shall be determined in the unanimous discretion of the Managers, who shall arrange for the appropriate conduct of such account or accounts. Any checks or disbursement of funds from the company bank accounts over $25,000 must be approved by all Managers.

        (b)      The books and records of the Company shall be kept, and the financial condition and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for Federal income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.  The Accounting year of the Company for financial reporting and for Federal income tax purposes shall be the Company Accounting Year.

        (c)      The Company shall keep at its principal office or at such other or additional offices (either within or without the District of Columbia) as the Managers shall deem advisable, (i) books and records setting forth a current list of the full name and last known address of each Member, (ii) a copy of the Articles and this Agreement, and all amendments thereto, (iii) copies of the Company's Federal, state and local income tax returns and personal property or intangible property tax returns, if any, for the three (3) most recent Company Accounting Years, (iv) copies of any financial statements of the Company for the three (3) most recent Company Accounting Years, which reflect the Company's state of business and financial condition during such periods and (v) any other information and/or records required by the Act. Each Member (and his duly authorized representative) shall have access to the books and records of the Company and the right to inspect and copy them, provided such request is reasonable, is done at reasonable hours and is done at such Member's personal expense.

        (d)      The Company may make all elections for Federal income tax purposes upon the decision of the Managers; provided, however, that, in case of a transfer of all or part of

the Interest of any Member or the distribution to a Member by the Company of its property, the election pursuant to I.R.C. Sections 734, 743 and 754 to adjust the basis of the Company Assets shall be timely made.

(e)     All Federal, state and local income tax returns, and financial and accounting books and records of the Company shall be prepared under the direction of the Managers, and all tax audits and litigation shall be conducted under the direction of the Managers.  Except as set forth in subparagraph 12(d), the determination of whether the Company shall make available elections for accounting or Federal, state or local income tax purposes shall be made by the Managers.  The Managers is hereby designated as the "tax matters Member" for the Company (as such term is defined in Section 6231(a)(7) of the I.R.C.).  The tax matters Member shall promptly notify Members who do not qualify as "notice Members" within the meaning of I.R.C. Section 6231(a)(8) at the beginning and completion of an administrative proceeding at the Company level promptly upon such notice being received by the tax matters Member.

14. <u>Assignability of Interests</u>.

(a)     (i)     Subject to the provisions of Sections 13(b), 14, and 15, no Member shall sell, assign, transfer, convey, pledge, encumber, or in any way alienate or dispose of all or any portion of such Member's Interests (a "Disposition") without delivering to the other Members a notice setting forth the terms and conditions of the proposed transfer and obtaining the prior written consent of the other Members (which consent shall be sole and absolute) as outlined by the rights and responsibilities in Exhibit C.  Notwithstanding anything to the contrary contained in this Agreement, an assignee of a Member shall not become a Substituted Member unless:  (i) the assigning Member so provides in the instrument of assignment, (ii) the assignee agrees in writing to be bound by the provisions of this Agreement, and (iii) the assigning Member, the Managers, the assignee and any other required signatory parties execute an amendment to this Agreement, which shall reflect, among other things, the admission of the assignee as a Substituted Member and the withdrawal of the assigning Member from the Company.

(ii)     Notwithstanding the provisions of Section 13(a)(i), but subject to the other provisions of this Section 13, in the event that a Member desires to sell, assign, transfer, convey, pledge, encumber, or in any way alienate all or any portion of its Interests to a purchaser (a "Purchaser"), such Member (the "Offeror Member") must first give to the other Member (the "Offeree Member"), notice of the Offeror Member's intention to make such Disposition, which notice shall specify the purchase price and payment terms upon which the Offeror Member is willing to sell its Interests to the Purchaser (the "Offer").  For a period of thirty (30) days from the receipt of such notice (the "Election Period"), the Offeree Member shall have the option (but not the obligation) to elect to purchase the Offering Member's Interests (or portion thereof) at the same price and upon the same terms and conditions as are set forth in the Offer.  The Offer shall be in effect and irrevocable for the entire Election Period, during which the Offeror Member shall be prohibited from selling or otherwise disposing of its Interests (or portion thereof).  If the Offeree Member chooses to accept the Offer, such Offeree Member shall so notify the Offeror Member within the Election Period and closing shall take place at a mutually agreed time, place and date not later than ninety (90) days after such election.  If such notice has not been given by

- 12 -

the Offeree Member prior to the expiration of the Election Period, or if the Offeree Member does not agree to purchase the Offeror Member's Interests (or portion thereof), the Offeror Member shall be free to dispose of its Interests to a third party, who or which is not Affiliated with the Offeror Member and is financially capable of carrying out the terms and conditions of the sale; provided, however, that any such Disposition shall be made within one hundred twenty (120) days after the expiration of the Election Period; and provided, further, that such Disposition shall be made for a purchase price no less than that contained in the Offer and on other terms and conditions at least as favorable to the Offeror Member as those contained in the Offer.  In the event that the Offeror Member's Interests are not so disposed of within said one hundred twenty (120)-day period, the provisions of this Section 13(a) shall again be applicable and must be complied with.

(b)    In the event that the Offeree Member waives or fails to exercise the option set forth in Section 13(a)(ii) above, then the Offeree Member shall have the option to participate in the Disposition with the Offeror Member, at the same price and upon the same terms and conditions as are set forth in the Offer (the "Tag-Along Right").  The Offeree Member shall have ten (10) days immediately following the expiration of the Election Period in which to notify the Offeror Member in writing of his or her election to exercise the Tag-Along Right (the "Tag-Along Period"). Notwithstanding anything contained in this Agreement to the contrary, the Tag-Along Right shall terminate if the Offeree Member (i) does not agree to be included in full with respect to the Percentage Interest required to be sold to the Purchaser pursuant to the terms of the Offer or (ii) discusses or negotiates the terms and conditions of the Disposition or the Offer with the Purchaser without the Offeror Member's prior written consent.

(c)    In the event that (i) the Offeree Member waives or fails to exercise the option set forth in Section 13(a)(ii) above, (ii) the Offeree Member waives or fails to exercise the option set forth in Section 13(b) above and (iii) the Offeror Member owns more than fifty percent (50%) of the Interests, the Offeror Member shall have the option to require the Offeree Member to sell all or a portion of its Interests to the Purchaser, as directed by the Offeror Member, at the same price and upon the same terms and conditions as are set forth in the Offer (the "Drag-Along Right"); provided, however, that if the Purchaser, pursuant to the terms of the Offer, is purchasing less than all of the outstanding Interests, then the Offeror Member and the Offeree Members shall sell to the Purchaser the specified portion of Interests on a pro rata basis in accordance with their respective Percentage Interests. The Offeror Member shall have ten (10) days after the expiration of the Tag-Along Period in which to notify the Offeree Member in writing of the Offeror Member's election to exercise the Drag-Along Right.

(d)    Notwithstanding anything contained in this Agreement to the contrary, it is expressly understood and agreed that no transfer of any Interests shall be made if such transfer would, or could, (i) jeopardize the partnership tax status of the Company for Federal and state income tax purposes or otherwise cause the Company to be treated as a publicly-traded partnership for Federal income tax purposes, (ii) result in a termination of the Company within the meaning of Code Section 708(b) unless all Members consent in writing to such transfer or substitution, or (iii) violate or cause the Company to violate, any state or Federal securities law or any other applicable law or governmental rule or regulation.

(e)    The Managers jointly shall have the right to admit additional Members to

- 13 -

the Company as outlined by the rights and responsibilities in Exhibit C.   Any authorized admission of additional Members under this Section 13(e) (in contrast to an assignment of existing Interests under Section 13(a)(i)) shall dilute, pro rata, the Percentage Interest of each Member existing at the time of such admission.

(f)   Unless named in this Agreement or otherwise admitted to the Company in accordance with the terms of this Agreement, no Person shall be considered a Member.   The Company, the Managers, each Member and any other Persons having business with the Company need deal only with Members so named or so admitted; they shall not be required to deal with any other Person by reason of an assignment by a Member or by reason of the termination of a Member, except as otherwise provided in this Agreement.   In the absence of the substitution of a Member for an assigning or terminated Member, any payment to a Member or to its legal representatives shall acquit the Company, the Managers and the Members of all liability to any other Person(s) who or which may be interested in such payment by reason of an assignment by, or the termination of, such Member.

15.   Member Meetings.

(a) Annual Meeting-The annual meeting of the Members shall be held within one hundred twenty (120) days after the close of the fiscal year of the Company each year for the purpose of discussing any and all related business activities of the Company. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day

(b) Place of Meeting-The persons calling the meeting may designate any place, either within or without the Continental United States, as the place of meeting for any annual meeting or for any special meeting called by the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the registered office of the Company in the District of Columbia.

16.   Bankruptcy of a Member.

(c) In the event of the Bankruptcy of a Member (the "Bankrupt Member"), the other Member (the "Continuing Members") shall have the option (but not the obligation), exercisable by giving notice thereof to the Bankrupt Member or to such Bankrupt Member's trustee in Bankruptcy, guardian, receiver or other legal representative, to purchase all (but not less than all) of the Bankrupt Member's Interests, within ninety (90) days after the event of such Bankruptcy, at a price equal to the Fair Market Value of such Interests.   Within sixty (60) days after the joint written report required to determine the Fair Market Value of such Bankrupt Member's Interests or written report of the third (3rd) appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option.   If such option is exercised, settlement shall be held within thirty (30) days from the date of such exercise.   The terms of payment shall be all cash or as otherwise agreed upon by the respective parties.

- 14 -

17. Withdrawal of Member.

(a)    Notwithstanding anything to the contrary contained in this Agreement, including, specifically, the provisions of Section 13(a), with respect to a Member which is a trust or other entity, the termination of a Member (hereinafter for purposes of this Section 15 referred to as a "Withdrawing Member"), then the other Member shall have the option (but not the obligation) to purchase all (but not less than all) of the Interest owned by the Withdrawing Member (the "Offered Interest") for the Fair Market Value of the Interest of the Withdrawing Member, in accordance with the other provisions of this Section 15.

(b)    The other Member shall have the option to purchase the Offered Interest by sending written notice thereto to the legal or personal representative of the Withdrawing Member within ninety (90) days following the death, adjudication of insanity or incompetency, or termination of the Withdrawing Member (defined in this Section 15 as the "Option Period"). If none of the Members elects to purchase the Offered Interest within the Option Period, then the estate or the personal or legal representatives of the Withdrawing Member shall have the right to retain all or any portion of the Offered Interest not otherwise elected to be purchased, subject to all of the provisions and restrictions of this Agreement.

(c)    In the event that the other Member elects to purchase all of the Offered Interest pursuant to the terms of this Section 15, settlement shall be held at the principal office of the Company at such time and date as shall be determined by the Company but in no event later than thirty (30) days after the expiration of the Option Period.  The party purchasing the Offered Interest under this Section 15 shall be required to pay cash at closing in an amount equal to ten percent (10%) of the purchase price and deliver a promissory note in the principal amount equal to the balance of the purchase price which promissory note shall accrue interest at the Applicable Federal Rate pursuant to §1274(d) of the Code and be payable in five (5) equal annual installments of principal and interest beginning on the first anniversary of the closing. At settlement on the purchase of the Offered Interest by the Member, the legal or personal representative of the Withdrawing Member and the purchasing Member shall execute an amendment to this Agreement and any other documents, instruments and agreements which may be necessary and appropriate to reflect, among other things, the transfer and assignment of the Offered Interest to the purchasing Member under this Section 15 and, to the extent applicable, the resignation and withdrawal of the Withdrawing Member as a Member in the Company, and the purchasing Member under this Section 15 shall deliver to the legal or personal representative of the Withdrawing Member the purchase price of the Interest of the Withdrawing Member in accordance with this Section 15, the other terms of which shall be mutually agreed to by the parties.

(d)    From and after the closing, the withdrawing Member shall have no further interest in the assets or Profit of the Company and shall not be responsible for any of its Loss, including Loss or liabilities arising after the closing, except uninsured, third-party tort claims arising out of acts or omissions which occurred prior to the closing and liabilities incurred by the selling Member or otherwise attributable to the actions of the selling Member and not disclosed to the purchasing Member prior to the date on which the purchasing Member elected to acquire the Interest of the withdrawing Member, and all obligations of the Company to the withdrawing

- 15 -

Member, including all Capital Accounts and, if applicable, any loans and advances, shall be deemed to be satisfied and discharged in full.

18. Deadlock.

(a)    Notwithstanding anything to the contrary contained in this Agreement, in the event, and only in the event, of a dispute or deadlock between the Members which they are unable to resolve themselves after using their best efforts to do so within thirty (30) days after written notice from one Member to the other Member citing such dispute or deadlock, either Member (hereinafter in this Section 16 referred to as "Offeror") may send written notice (such written notice being hereinafter referred to as a "Buy-Sell Notice") to the other Member (hereinafter in this Section 16 referred to as "Offeree"), stating Offeror's willingness to purchase the entire Interest of Offeree for an amount equal to the Offeree's good faith estimate of the fair market value of all of the Company assets multiplied by the Percentage Interest owned by Offeree (the "Purchase Price"), and Offeree shall have the option to do either of the following:

(i)    to purchase all of Offeror's Interest for an aggregate amount equal to the Purchase Price; or

(ii)    to sell all of Offeree's Interest for an aggregate amount equal to the Purchase Price.

Simultaneously with the sending of such Buy-Sell Notice, Offeror shall deposit in escrow by good check with the independent certified public accountant or, if none, an attorney, then servicing the Company (such person being hereinafter referred to as "Escrow Agent"), who shall act as a bona fide escrow agent, an amount equal to five percent (5%) of the Purchase Price.

(b)    The option under Section 16 hereof shall be exercised by Offeree sending written notice thereof to Offeror within thirty (30) days following, as the case may be, its receipt of such Buy-Sell Notice (the "Offeree Election Period") the determination of the Appraised Value of the Company, which notice from Offeree shall specify which of the two (2) alternatives above Offeree has elected.  In the event that Offeree elects to purchase all of Offeror's Interest under the alternative set forth in Section 16(a)(i) hereof, then, simultaneously with the sending of such notice, Offeree shall deposit in escrow with Escrow Agent an amount equal to five percent (5%) of the Purchase Price, and Escrow Agent shall promptly return to Offeror the deposit placed by Offeror in escrow.  The failure or refusal by Offeree timely to elect either of the two (2) alternatives afforded him under and pursuant to Section 16 hereof shall be conclusively deemed for purposes of this Section 16 to constitute an election by Offeree to sell all of its Interest in the Company to Offeror for the Purchase Price under the alternative set forth in Section 16(a)(ii) hereof.

(c)    Settlement on the purchase of all of the Interest of either Offeror or Offeree (as the case may be) under this Section 16 shall be held at the principal office of the Company within ninety (90) days after the expiration of the Offeree Election Period or within ninety (90) days after Offeree's election by written notice specified in Section 16(b) hereof,

- 16 -

whichever occurs sooner, upon the following terms and conditions:  The entire purchase price for the Interest being conveyed (less the amount previously placed in escrow, which amount shall be released by Escrow Agent at settlement to the Member whose Interest is being so conveyed and shall be credited against purchase price at settlement), shall be paid as follows:  (i) twenty percent (20%) of the purchase price shall be paid at settlement in immediately available funds, and (ii) the balance of the purchase price by the execution and delivery to the selling Member of a negotiable promissory note in the original principal amount of the balance of such purchase price, which promissory note shall be payable in three (3) equal annual installments of principal, together with interest thereon at a rate equal to the "prime rate" (or the average of such rate if set forth in a range) published in the "Money Rates Section" of <u>The Wall Street Journal</u> as of the date of settlement.  The first principal payment under such promissory note shall be due and payable on the first annual anniversary of the settlement date, with the remaining payments due on each of the two (2) succeeding annual anniversaries thereafter.  The promissory note shall be secured by all of the Interest owned by such selling Member pursuant to a separate security agreement and shall be subject to release therefrom on a proportionate basis as principal curtailments are made under the promissory note.

(d)     In connection with any sale and purchase of an Interest under this Section 16, the following terms of purchase and sale shall also be applicable:  (a) escrow costs, if any, and all other costs of the transaction shall be paid by the purchasing Member; (b) each of Offeror and Offeree shall bear its own legal and accounting fees, if any; and (c) at least five (5) business days prior to the settlement, the selling Member shall deliver all appropriate documents of transfer and other transaction documents to the purchasing Member.

(e)     From and after the closing, the selling Member shall have no further interest in the assets or Profit of the Company and shall not be responsible for any of its Loss, including Loss or liabilities arising after the closing, except uninsured, third-party tort claims arising out of acts or omissions which occurred prior to the closing and liabilities incurred by the selling Member or otherwise attributable to the actions of the selling Member and not disclosed to the purchasing Member prior to the date on which the purchasing Member elected to acquire the Interest of the selling Member, and all obligations of the Company to the selling Member, including all Capital Accounts and, if applicable, any loans and advances, shall be deemed to be satisfied and discharged in full.

(f)     In the event that neither Member elects to purchase or sell its Interest pursuant to the terms of this Section 16 and, in the further event that the Members are unable to resolve the subject dispute or deadlock between the Members with respect to any decision and/or action in connection with the management and operation of the Company, the Members hereby agree to cause the dissolution and liquidation of the Company and its assets pursuant to the terms of Section 17 hereof.

19. <u>Dissolution and Termination of Company</u>.

(a)     The Company shall be dissolved, the Company Assets shall be disposed of, and its affairs wound up, upon the earliest to occur of the following events (an "Event of Dissolution"), it being understood and agreed that the death, adjudication of insanity or

- 17 -

incompetency, withdrawal and/or Bankruptcy of a Member, or other event of cessation of a Member from the Company pursuant to §13.1-1040.1 of the Act, shall not constitute an Event of Dissolution:

        (i)     the unanimous written consent of the Members as outlined by the rights and responsibilities in Exhibit C; or

        (ii)    the entry of a decree of judicial dissolution under the Act; or

        (iii)   at any time the Company has no Members; provided, however, that, if, within one hundred eighty (180) days after the occurrence of the event that caused the dissociation of the last remaining Member, the personal or legal representative of the last remaining Member agrees in writing to continue the Company until the admission of a new Member or new Members, then the Company shall not be dissolved and the Company and the Company business shall be continued effective as of the date of the event that caused the dissociation of the last remaining Member; or

        (iv)   the occurrence of any other event causing the dissolution of a limited liability company under the laws of the District of Columbia.

        (v)    upon the occurrence of section 16(f)

(b) The Company shall terminate when all the Company Assets have been disposed of (except for any liquid assets not so disposed of), and the net proceeds therefrom, as well as any other liquid or illiquid assets of the Company, shall, unless otherwise required by the Act, be distributed as follows:  (i) first, to the creditors of the Company for the payment or due provisions for the liabilities of the Company (including loans, if any, to the Company from Members), and (ii) second, to the Members, pro rata, in accordance with their respective positive Capital Account balances.

(c) Following the distribution of the net proceeds under subparagraph 17(b) hereof and the completion of winding up the affairs of the Company, the Managers, or, if none, any Member, is hereby authorized and directed to have prepared and file a certificate of cancellation of the Company with the District of Columbia DCRA, in accordance with the DC LLC Act, and take any and all other actions as may be necessary and/or appropriate under the Act to dissolve and terminate the Company.

    20. Mediation.

    a.   *If a dispute arises out of or relates to this contract, or the alleged breach thereof, and if the dispute is not settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation within 30 days administered under the legal counsel of Home Team Title, before resorting to arbitration, litigation, or some other dispute resolution procedure. In the event that parties are unable to agree on a mediator, a mediator shall be*

*appointed by the named administrator. The process shall be confidential based on terms acceptable to the mediator and/or mediation service provider*

21. Miscellaneous Provisions.

(a)    The Members hereby agree to execute and deliver all documents (subject to the provisions of subparagraph 18(d) hereof), provide all information and take or refrain from all such action as may be reasonably necessary or appropriate to achieve the purposes of this Agreement and the Articles.

(b)    Except as expressly provided in this Agreement, nothing contained herein shall be construed to constitute any Member the agent of any other Member hereof or to limit in any manner the Members in the carrying on of their own respective businesses or activities. Any Member may engage in and/or possess any interest in other business ventures of every nature and description, independently or with others, whether existing as of the date hereof or hereafter coming into existence, and whether or not directly competitive with the business of the Company; and neither the Company nor any Member hereof shall have any rights in or to any such independent ventures or the income or profits derived therefrom.

(c)    All notices provided for herein shall be in writing, hand delivered, with receipt therefor, or sent by certified or registered mail, return receipt requested, and first-class postage prepaid, or by overnight courier, to the address of each Member as shown in Exhibit A, unless notice of a change of address is given to the Company pursuant to the provisions of this subparagraph 18(c). Any notice which is required to be given within a stated period of time shall be considered timely if delivered or postmarked before midnight of the last day of such period. Any notice made hereunder shall be deemed effective for all purposes and in all respects three (3) business days after such notice is sent (or caused to be sent) to any Member at the address set forth in Exhibit A hereof, or at such other address specified by a Member for which notice has been received by the Company in accordance with this subparagraph 18(c).

(d)    Each Member (who or which is not otherwise the Manager) hereby irrevocably makes, constitutes and appoints the Managers as his true and lawful attorney-in-fact and agent with full power and authority in his name, place and stead to make, execute, sign, acknowledge, deliver, file and record with respect to the Company the following:

(i)    All amendments to this Agreement and Exhibits and/or the Articles and all other instruments and documents which the Managers deems appropriate to qualify or to continue the Company as a limited liability company in each jurisdiction in which the Company conducts business;

(ii)    All instruments which the Managers deems appropriate to reflect (A) any change or modification of the terms and conditions governing the relationship among the Members and the Company or (B) an amendment of this Agreement and Exhibits and/or the Articles that does not materially adversely affect the rights of the Members hereof;

(iii)    All conveyances and other instruments, certificates or documents which the Managers deems appropriate to effect, evidence and/or reflect any sales or transfers

- 19 -

by, or the dissolution, termination and/or liquidation of, the Company, including any sales or transfer of Interests in the Company pursuant to this Agreement;

(iv)    All such other instruments, documents and certificates which may from time to time be required by the Company, its mortgage lenders, the Internal Revenue Service, the District of Columbia, the United States of America, or any political subdivision within which the Company conducts its business, to effectuate, implement, continue and defend the valid and continuing existence of the Company as a limited liability company and to carry out the intention and purpose of this Agreement; and

(v)    All amendments to this Agreement and any other documents, instruments and certificates which may be required to admit Members.  If a Member assigns his Interest in the Company under and pursuant to paragraph 13 hereof, the foregoing power of attorney shall survive the delivery of the instruments effecting such assignment for the purpose of enabling the Managers to sign, swear to, execute, acknowledge and file any amendments to the Articles and other instruments and documents in order to effectuate the substitution of the assignee as a Member.  It is expressly intended that the foregoing power of attorney under this subparagraph 18(d) is a durable power of attorney which shall not be affected by the subsequent physical or mental disability or incapacity of a Member, and such power of attorney is coupled with an interest; provided, however, that the Managers shall not exercise the same in any manner which would (A) enlarge any obligation or liability of a Member, or (B) affect any Company distributions in a manner materially adverse to any Member, except to the extent any Member adversely affected thereby has previously consented thereto in writing.

(e)    This Agreement and the rights of the parties hereunder will be governed by, interpreted and enforced in accordance with the laws of the District of Columbia, without regard to principles of conflicts of laws or choice of laws.

(f)    This Agreement shall inure to the benefit of and bind the parties hereto, their estates, heirs, personal or legal representatives, stockholders, officers, directors, partners, beneficiaries, trustees, custodians, managers, members, successors and, subject to the provisions of paragraph 13 hereof, assigns.

(g)    Unless the context clearly indicates otherwise, where appropriate the singular shall include the plural and the neuter shall include the masculine and the feminine, and vice versa, to the extent necessary to give the terms defined herein and/or the terms otherwise used in this Agreement their proper meanings.

(h)    This Agreement and Exhibits A to D attached hereto and the Articles set forth all (and are intended by all parties hereto to be an integration of all) of the promises, agreements, conditions, understandings, warranties and representations among the parties hereto with respect to the Company, the Company's business and the Company Assets, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, except as set forth herein.

- 20 -

(i)     If any provision of this Agreement is held to be illegal, invalid or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

(j)     This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective estates, heirs, personal or legal representatives, stockholders, officers, directors, partners, beneficiaries, trustees, custodians, managers, members, successors and assigns, subject to the express provisions hereof relating to estates, heirs, personal or legal representatives, stockholders, officers, directors, partners, beneficiaries, trustees, custodians, managers, members, successors and assigns, and no other Person will have any rights, interest or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.  In furtherance of and not in limitation of the foregoing, nothing contained in this Agreement is intended to be for the benefit of any creditor or other Person (other than a Member in his capacity as a member) to whom or which any debts, liabilities or obligations are owed by (or who or which otherwise has any claim against) the Company or any Member; and no such creditor or other Person shall obtain any right hereunder against the Company or any Member by reason of any debt, liability or obligation (or otherwise).

(k)     This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

*[Signatures appear on the following pages.]*

- 21 -

IN WITNESS WHEREOF, the undersigned parties have executed this Operating Agreement as of the date first above written.

WITNESS:


WITNESS:                                    **SADEGH JAFARI:**


_____        By: _____ (SEAL)
                                             SADEGH JAFARI, Manager/Member



WITNESS:                                    **MITRA DADASHZADEH:**


_____        By: _____ (SEAL)
                                             MITRA DADASHZADEH, Member

**<u>EXHIBIT A</u>**
**<u>TO</u>**
**<u>OPERATING AGREEMENT</u>**
**<u>OF</u>**
**<u>1416 EASTERN AVE NE LLC</u>**

<u>Initial Capital Contributions and Assigned Percentage Interests at Company Inception</u>

| <u>Sadegh Jafari</u> | <u>Initial Capital Contributions</u> | <u>Assigned Percentage Interests</u> |
|---|---|---|
| 2339 Rosedown Dr Reston, VA 20191 | Guarantor | <u>50</u>% |

| <u>Mitra Dadashzadeh</u> | <u>Initial Capital Contributions</u> | <u>Initial Percentage Interests</u> |
|---|---|---|
| 2339 Rosedown Dr Reston, VA 20191 | <u>Guarantor</u> | 50% |

|  | TOTALS | <u>100%</u> |
|---|---|---|

## **EXHIBIT B**
## **TO**
## **OPERATING AGREEMENT**
## **OF**
## **1416 EASTERN AVE NE LLC**

<u>Legal Description of the Property</u>

**[See Attached]**

**EXHIBIT C**
**TO**
**OPERATING AGREEMENT**
**OF**
**1416 EASTERN AVE NE LLC**

Rights and Responsibilities

Each of the Managers and Members shall have rights and responsibilities over a defined set of activities as outlined in the matrix below. For each activity outlined below, the responsible set of Managers or Members, shall each be entitled to one vote (as represented by a checkmark in the below matrix). Decisions for each activity shall require a unanimous vote by the responsible set of Managers or Members.

| Rights & Responsibilities | Sadegh Jafari | Mitra Dadashzadeh |
|---|---|---|
| Approval of building/land purchase | ✓ | ✓ |
| Approval of initial apartment design/spec | ✓ | ✓ |
| Construction budget/draw schedule - development | ✓ | ✓ |
| Construction budget/draw schedule - approval | ✓ | ✓ |
| Decisions on day to day ops and administrative items | ✓ | ✓ |
| Veto decisions on day to day ops and administrative items | ✓ | ✓ |
| Staffing and supervision of construction (execution of budget) | ✓ | ✓ |
| Approval of contracts exceeding/outside approved budget | ✓ | ✓ |
| Decisions on day to day ops and administrative items | ✓ | ✓ |
| Approval of changes in budget | ✓ | ✓ |
| Approval of changes in apartment design/spec | ✓ | ✓ |
| Approval of tenant payouts exceeding/outside approved budget | ✓ | ✓ |
| Responsibility for eviction of non-target tenants (execution of budget) | ✓ | ✓ |
| Approval of initial contracts/vendors (other than bldg. mgmt. co.) | ✓ | ✓ |
| Approval of change in contracts/vendors (other than bldg. mgmt. co.) | ✓ | ✓ |
| Selection of initial building management company | ✓ | ✓ |
| Approval of initial building management company | ✓ | ✓ |
| Approval of change in building management company | ✓ | ✓ |
| Approval of timing and terms and conditions of refinance | | |
| Responsibility for operationally executing terms and conditions of refinance as approved | ✓ | ✓ |
| Approval of new loans (3rd party/partners) incl. terms and conditions | ✓ | ✓ |
| Approval of new/additional capital contributions | ✓ | ✓ |
| Approval of assignment of equity interests | ✓ | ✓ |
| Approval of changes to this Agreement and vendor Agreements | ✓ | ✓ |
| Approval of new/additional partners | ✓ | ✓ |

# OPERATING AGREEMENT
## OF
## 1416 EASTERN AVE NE LLC

## TABLE OF CONTENTS

1.    Definitions ............................................................................................................1

2.    Name of Company.................................................................................................5

3.    Formation of Company .........................................................................................5

4.    Company Purposes ...............................................................................................6

5.    Principal Office; Resgistered Agent .....................................................................6

6.    Capital Contributions ...........................................................................................6

7.    Allocation of Income and Losses .........................................................................7

8.    Distributions of Net Cash Flow ...........................................................................7

9.    Resignation; Return of Capital .............................................................................8

10.   Legal Title to Company Assets .............................................................................8

11.   Management; Indemnification ..............................................................................8

12.   Bank Accounts; Books and Records ...................................................................11

13.   Assignability of Interests ...................................................................................12

14.   Member Meetings ...............................................................................................14

15.   Bankruptcy of a Member ....................................................................................14

16.   Withdrawal of a Member ....................................................................................15

17.   Deadlock..............................................................................................................16

18.   Dissolution and Termination of Company .........................................................17

19.   Miscellaneous Provisions....................................................................................19

### ADDENDUM TO OPERATING AGREEMENT
Addendum A

As of January 1, 2024, Ali Razjooyan will be named as a managing non-equity member, having the authority to sign on and conduct business activities on behalf of the entity

SADEGH JAFARI                     01-01-24
                                  DATE

MITRA DADASHZADEH                 01-01-24
                                  DATE

ALI RAZJOOYAN                     01-01-24
                                  DATE